Joseph J. Tabacco, Jr. (SBN 75484)
Todd A. Seaver (SBN 271067)
Jessica Moy (SBN 272941)
Sarah Khorasanee McGrath (SBN 263935)
**BERMAN TABACCO**
44 Montgomery Street, Suite 650
San Francisco, CA  94104
Telephone: (415) 433-3200
Facsimile:  (415) 433-6382
Email: jtabacco@bermantabacco.com
        tseaver@bermantabacco.com
        jmoy@bermantabacco.com
        smcgrath@bermantabacco.com

*Attorneys for Plaintiff*

[Additional Counsel on Signature Page]

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| CAMBRIDGE CAPITAL CORPORATION, on behalf of themselves and others similarly situated,<br><br>          Plaintiff,<br><br>    v.<br><br>MURATA MANUFACTURING CO., LTD.; MURATA ELECTRONICS NORTH AMERICA, INC.; PANASONIC CORPORATION; PANASONIC CORPORATION OF NORTH AMERICA; PANASONIC INDUSTRIAL DEVICES CORPORATION OF AMERICA; SUMIDA CORPORATION; SUMIDA ELECTRIC CO., LTD.; SUMIDA AMERICA COMPONENTS, INC.; TAIYO YUDEN CO., LTD.; TAIYO YUDEN (U.S.A.) INC.; TDK CORPORATION; TDK-EPC CORPORATION; TDK CORPORATION OF AMERICA, and TDK U.S.A. CORPORATION,<br><br>          Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br><u>JURY TRIAL DEMANDED</u><br><br><u>CLASS ACTION</u> |

Plaintiff Cambridge Capital Corporation ("Plaintiff"), individually and on behalf of a class of all those similarly situated (the "Class"), brings this action for damages and injunctive relief under the antitrust laws of the United States against the defendants names herein, and allege, based upon the investigation of counsel and on information and belief, as follows:

## I.    OVERVIEW

1.    Defendants,[1] the world's largest suppliers of Inductors (defined below) to the United States, engaged in a conspiracy to fix, raise, stabilize, and maintain the prices of Inductors from at least January 1, 2003 through December 31, 2016 (the "Class Period").

2.    An inductor is an electronic component that creates a magnetic field when an electric current is run through it.  The inductor stores energy in the magnetic field so long as the current flows. Inductors can work as a switch-mode power supply, to efficiently control the conversion of electrical power.  Along with capacitors and resistors, inductors work to stabilize currents in electronic equipment, and are called "passive electronic components" and are ubiquitous in consumer and other products that rely on electric power.  Inductors are an essential part of an electric circuit and are used in electronic equipment including desktop and notebook computers, televisions, video game consoles, analog audio/visual equipment, and other consumer electronics, as well as advanced driver assistance systems ("ADAS") in vehicles, and industrial induction motors (converting electrical into mechanical energy). Inductors have many types, including surface mount types (common in smaller, mobile devices), chokes, radio frequency, coupled, multi-layer, and molded.  The various types of inductors are referred to herein as "Inductors."

3.    The global market for Inductors was estimated to be worth $2.78 billion in 2014 and $3.86 billion in 2015.  The North American market in 2015 was estimated to be worth $965 million.  The Defendants control over 75% of the global Inductor market.

---

[1] Murata Manufacturing Co., Ltd.; Murata Electronics North America, Inc.; Panasonic Corporation; Panasonic Corporation of North America; Panasonic Industrial Devices Corporation of America; Sumida Corporation; Sumida Electric Co., Ltd.; Sumida America Components, Inc.; Taiyo Yuden Co., Ltd.; Taiyo Yuden (U.S.A.) Inc.; TDK Corporation; TDK-EPC Corporation; TDK Corporation of America; and TDK U.S.A. Corporation.

4.    On January 4, 2018, MLex media company reported that the San Francisco office of the Department of Justice, Antitrust Division ("DOJ") sent subpoenas to Inductor manufacturers in November 2017.

5.    Panasonic has possibly provided the DOJ with information regarding the Inductor conspiracy alleged herein. Panasonic reportedly provided DOJ with information regarding a capacitor conspiracy, where seven companies have since pled guilty to antitrust violations.

6.    Panasonic has also pled guilty in numerous other price-fixing cases including: (a) refrigerant compressors, (b) automotive parts, and (c) cylindrical lithium ion battery cells (guilty plea from Panasonic's subsidiary, SANYO).

7.    The DOJ also obtained a series of guilty pleas in the capacitor conspiracy.[2] The conduct in question included, *inter alia*: (a) agreements to fix the prices of capacitors reached at face-to-face meetings; (b) collusive bidding to customers who asked for pricing on capacitors; (c) exchanges and monitoring of price, sales, bid, supply, demand, shipping and production of capacitors; and (d) fraudulent concealment of the conspiracy. Some of the fines on corporate plea-takers were rejected by the Honorable District Judge James Donato for being too low.

8.    It was reported that Panasonic Corporation approached the DOJ and sought leniency with respect to the capacitor conspiracy. Defendant Taiyo Yuden Co., Ltd. has also acknowledged cooperating with investigators with regard to the capacitor conspiracy.

9.    The effects of the Inductor conspiracy can be seen in this chart, from Federal Reserve Economic Data:

///

///

///

---

[2]    https://www.justice.gov/opa/pr/seventh-company-agrees-plead-guilty-fixing-prices-electrolytic-capacitors.



This price index for imported Inductors (as well as related electronic equipment), shows the dramatic Inductor price increases during the Class Period. Inductor prices even continued to rise from 2008 to 2009, during the worldwide recession.

       10.     These price increases took place despite the steady cost of raw materials during the Class Period. The following chart shows the stable, and eventual declining, prices for passive electronic component raw materials:



## II.    JURISDICTION AND VENUE

11.    Plaintiff brings this action under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, to recover treble damages and the costs of this suit, including reasonable attorneys' fees, against Defendants for the injuries sustained by Plaintiff and members of the Class resulting from Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and to enjoin further violations.

12.    This Court has jurisdiction over the subject matter of this action pursuant to Section 16 of the Clayton Act (15 U.S.C. § 26), Section 1 of the Sherman Act (15 U.S.C. § 1), and Title 28, United States Code, Sections 1331 and 1337.

13.    Venue is proper in this District pursuant to Section 12 of the Clayton Act (15 U.S.C. § 22), and 28 U.S.C. §§ 1391 (b), (c), and (d), because a substantial part of the events giving rise to Plaintiff's claims occurred in this District, a substantial portion of the affected interstate trade and commerce discussed below has been carried out in this District, and one or more Defendants reside, are licensed to do business in, are doing business in, had agents in, or are found or transact business in this District.

14.    This Court has *in personam* jurisdiction over each Defendant because each Defendant, either directly or through the ownership and/or control of its United States subsidiaries: (a) transacted business in the United States, including in this District; (b) sold or marketed substantial quantities of Inductors throughout the United States, including in this District; (c) had substantial aggregate contacts with the United States as a whole, including in this District; (d) was engaged in a price-fixing conspiracy that had an effect on commerce in the United States and this District; or (e) purposefully availed itself of the laws of the United States.

## III.    PARTIES

### A.    Plaintiff

15.    Plaintiff Cambridge Capital Corporation ("Cambridge") is a New York corporation with a principal place of business in Florida.  Cambridge is the successor-in-interest to Univisions-Crimson Holding, Inc. ("UCH"), a company that during the Class Period

purchased Inductors and/or products containing Inductors directly from one or more of the Defendants.

16.     Cambridge has suffered injury as a result of the unlawful conduct alleged herein.

**B.    Murata Defendants**

17.     Defendant Murata Manufacturing Co., Ltd. ("Murata Manufacturing") is a Japanese corporation with its principal place of business located at 10-1, Higashikotari 1-chome, Nagaokakyo-shi, Kyoto 617-8555, Japan. Murata Manufacturing, directly and/or through its wholly-owned and or controlled predecessors and subsidiaries, manufactured, marketed, and/or sold Inductors in the United States during the Class Period. Murata Manufacturing is one of the largest global manufacturers of passive electronic components.

18.     In March 2014, Murata Manufacturing acquired controlling interest in TOKO, Inc. ("TOKO"), a leading Inductor manufacturer in Japan that sold hundreds of millions of dollars of Inductors in the United States during the Class Period. In April of 2015, Murata Manufacturing assumed all aspects of TOKO's business, including its assets, sales, service, and technical support for the portfolio of TOKO products, including Inductors.

19.     Defendant Murata Electronics North America, Inc. ("MENA") is a wholly-owned subsidiary of Murata Manufacturing (with Murata Manufacturing and TOKO, "Murata"), a Texas corporation with its principal place of business located at 2200 Lake Park Drive SE, Smyrna, Georgia 30080-7604. MENA, directly and/or through its wholly-owned and/or controlled subsidiaries, manufactured, marketed, and/or sold Inductors that were purchased in the United States during the Class Period.

20.     Murata Manufacturing also operates Murata Americas RF Product Department ("Murata RF") in the United States, with offices in Carrollton, Texas and Duluth, Georgia.

21.     Defendants Murata Manufacturing and MENA are collectively referred to as "Murata."

**C.    Panasonic Defendants**

22.     Defendant Panasonic Corporation is a Japanese corporation with its principal place of business located at 1006, Oaza Kadoma, Kadoma-shi, Osaka 571-8501, Japan.

Panasonic Electronic Devices Co. Ltd. ("PED") was a former Japanese subsidiary of Panasonic Corporation that was a leading manufacturer of Inductors.  In August 2011, Panasonic Corporation absorbed wholly-owned subsidiary PED.  PED had substantial sales of Inductors in the United States during the Class Period. Panasonic is responsible for the acts of its wholly-owned and controlled subsidiary PED, and Plaintiff will seek to hold Panasonic Corporation liable for any violations of Section 1 of the Sherman Act (15 U.S.C. §1) by PED that occurred during the Class Period.

23.    Defendant Panasonic Corporation of North America ("PCNA"), a wholly-owned subsidiary of Panasonic Corporation, is a Delaware corporation with its principal place of business located at Two Riverfront Plaza, 7th Floor, Newark, New Jersey 07102. Panasonic Broadcast and Television Systems Company is a unit of PCNA, which is in turn a wholly-owned subsidiary of Panasonic Corporation. PCNA, directly or through its business units, subsidiaries, agents, or affiliates, sold and distributed Inductors manufactured by business units, subsidiaries, agents, or affiliates of its corporate parent, Panasonic Corporation, in the United States during the Class Period.

24.    Defendant Panasonic Industrial Devices Corporation of America ("Panasonic Industrial"), a wholly-owned subsidiary of Panasonic Corporation, is a Delaware corporation with its principal place of business located at Two Riverfront Plaza, 7th Floor, Newark, New Jersey 07102.  On or about Janaury 12, 2012, Panasonic Electronic Devices Corporation of America changed its name to Panasonic Industrial. Panasonic Industrial manufactured and sold Inductors during the Class Period.

25.    Defendants Panasonic Corporation, PCNA, and Panasonic Industrial are collectively referred to as "Panasonic."

### D.    Sumida Defendants

26.    Defendant Sumida Corporation is a Japanese company with its principal place of business located at Harumi Island Triton Square Office Tower X 14/F, 1-8-10 Harumi, Chuo-Ku, Tokyo, 104-8547, Japan. Sumida Corporation is a holding company for Sumida Electric Co. Ltd., which is the corporate parent of Sumida America Components Inc.

27.     Defendant Sumida Electric Co. Ltd. ("Sumida Electric") is a Japanese corporation with its principal place of business located at 3-6, 3-Chome, Ningyo-cho, Nihonbashi, Chuo-ku, Tokyo 103-8589, Japan. Sumida Electric, directly and/or through its wholly-owned and/or controlled predecessors and subsidiaries, manufactured, marketed, and/or sold Inductors in the United States during the Class Period.

28.     Defendant Sumida America Components Inc. ("Sumida America") is a Delaware corporation with its headquarters at 1251 N Plum Grove Road, Suite 150, Schaumburg, Illinois 60173. Sumida America also has offices in this District, at 1885 Lundy Avenue, Suite 250, San Jose, California 95131. Sumida America, directly or through its business units, subsidiaries, agents, or affiliates, sold and distributed Inductors manufactured by business units, subsidiaries, agents, or affiliates of its corporate parent, Sumida Electric, in the United States during the Class Period.

29.     Defendants Sumida Corporation, Sumida Electric and Sumida America are collectively referred to as "Sumida."

**E.     Taiyo Yuden Defendants**

30.     Defendant Taiyo Yuden Co., Ltd. ("Taiyo Yuden Co.") is a Japanese corporation with its principal place of business located at 6-16-20, Ueno, Taito-ku, Tokyo 110-0005, Japan. Taiyo Yuden Co., directly and/or through its wholly-owned and/or controlled predecessors and subsidiaries, manufactured, marketed, and/or sold Inductors in the United States during the Class Period.

31.     Defendant Taiyo Yuden (USA) Inc. ("Taiyo Yuden USA"), an Illinois corporation, is a wholly-owned subsidiary of Taiyo Yuden Co., with its principal place of business located at 440 Stevens Avenue, Ste. 300, Solano Beach, CA 92075. Taiyo Yuden USA, directly or through its business units, subsidiaries, agents, or affiliates, sold and distributed Inductors manufactured by business units, subsidiaries, agents, or affiliates of its corporate parent, Taiyo Yuden Co., in the United States during the Class Period.

32.     Defendants Taiyo Yuden Co. and Taiyo Yuden USA are collectively referred to as "Taiyo Yuden."

**F.     TDK Defendants**

33.     Defendant TDK Corporation is a Japanese corporation with its principal place of business at Shibaura Renasite Tower, 3-9-1 Shibaura, Minato-ku, Tokyo 108-0023, Japan. TDK Corporation, directly and/or through its wholly-owned and/or controlled predecessors and subsidiaries, manufactured, marketed, and/or sold Inductors in the United States during the Class Period.

34.     Defendant TDK-EPC Corporation ("TDK-EPC") is a Japanese corporation with its principal place of business located at Shibaura Renasite Tower, 3-9-1 Shibaura, Minato-ku, Tokyo 108-0023, Japan. TDK-EPC was founded on October 1, 2009 from the combination of the passive components businesses of TDK Corporation and non-party EPCOS AG, a German corporation. TDK-EPC, directly and/or through its wholly-owned and/or controlled predecessors and subsidiaries, manufactured, marketed, and/or sold Inductors in the United States during the Class Period.

35.     Defendant TDK U.S.A. Corporation ("TDK USA"), a New York corporation, is a wholly-owned subsidiary of TDK Corporation with its principal place of business located at 455 RXR Plaza, Uniondale, New York 11556. During the Class Period, TDK USA, directly or through its business units, subsidiaries, agents, or affiliates, sold and distributed Inductors manufactured by business units, subsidiaries, agents, or affiliates of its corporate parents, TDK Corporation and TDK-EPC, in the United States.

36.     Defendant TDK Corporation of America ("TDK America") is a subsidiary of TDK Corporation with its principal place of business at 475 Half Day Road, Suite 300, Lincolnshire, Illinois 60069. TDK America sold and distributed Inductors manufactured by business units, subsidiaries, agents, or affiliates of its corporate parent, TDK Corporation, in the United States.

37.     Defendants TDK Corporation, TDK-EPC, TDK USA, and TDK America, are collectively referred to as "TDK."

38.     TDK was the largest manufacturer of Inductors during the Class Period. Since the 2009 combination, TDK sells TDK and EPCOS-branded Inductors.

CLASS ACTION COMPLAINT                                                          8

### G.    Agents and Co-Conspirators

39.    Defendants' officers, directors, agents, employees, or representatives are engaged in the conduct alleged in this Complaint in the usual management, direction, or control of Defendants' business or affairs.

40.    Defendants are also liable for acts done in furtherance of the alleged conspiracy by companies they acquired through mergers and acquisitions.

41.    When Plaintiff refers to a corporate family or companies by a single name in this Complaint, they are alleging that one or more employees or agents of entities within that corporate family engaged in conspiratorial acts on behalf of every company in that family. The individual participants in the conspiratorial acts did not always know the corporate affiliation of their counterparts, nor did they distinguish between the entities within a corporate family. The individual participants entered into agreements on behalf of their respective corporate families. As a result, those agents represented the entire corporate family with respect to such conduct, and the corporate family was party to the agreements that those agents reached.

42.    Each Defendant acted as the agent of, co-conspirator with, or joint venturer of the other Defendants and co-conspirators with respect to the acts, violations and common course of conduct alleged in this Complaint. Each Defendant or co-conspirator that is a subsidiary of a foreign parent acted as the United States agent for Inductors.

43.    Various persons, partnerships, sole proprietors, firms, corporations, and individuals not named as Defendants in this lawsuit, and individuals, both known and unknown, participated as co-conspirators with Defendants in the offenses alleged in this Complaint, and performed acts and made statements in furtherance of the conspiracy. Plaintiff reserves the right to name some or all of these persons and entities as Defendants at a later date.

## IV.    AFFECTED COMMERCE

44.    During the Class Period, each Defendant and co-conspirator, or one or more of its subsidiaries, affiliates, and/or joint ventures, sold Inductors in the United States in a continuous and uninterrupted flow of interstate commerce and foreign commerce, including through and into this judicial District.

45.     During the Class Period, Defendants sold Inductors directly to customers located in the United States. Such conduct constitutes United States import trade and/or import commerce.

46.     In addition, substantial quantities of equipment and supplies necessary to the production and distribution of Inductors, as well as payments for Inductors, and related products sold by Defendants and purchased by Plaintiff and members of the Class, traveled in United States domestic interstate commerce, United States import and export commerce, and foreign trade and commerce.

47.     The activities of Defendants in connection with the production, sale, and/or importation of Inductors, and the conduct of Defendants and their co-conspirators as alleged in this Complaint: (a) constituted United States domestic interstate trade or commerce; (b) constituted United States import trade or import commerce; and/or (c) were within the flow of and had a direct, substantial, and reasonably foreseeable effect on United States domestic trade or commerce and/or United States import trade or commerce. Given the marketing, importation, and sales by Defendants of Inductors in the United States, and the volume of affected commerce, such effects were direct and substantial.

48.     Such effects, including the artificially raised and inflated prices that Plaintiff and members of the proposed Class paid for Inductors during the Class Period, caused antitrust injury in the United States to Plaintiff and members of the proposed Class, and give rise to their claims under Section 1 of the Sherman Act.

## V.    FACTUAL ALLEGATIONS

49.     Plaintiff incorporates by reference the factual allegations made in previous sections.

### A.    Inductor Functions and Varieties

50.     Inductors are passive electronic components in a circuit that temporarily store energy using a magnetic field. A variety of Inductors are pictured below:

//

//

1

2

3

4

5

6

7

8

9

10



11    51.    The structure of an Inductor can be a simple metal wire wrapped around some

12 form of a core. Currently, the principal type of Inductors are air core Inductors, iron core

13 Inductors, ferrite core Inductors, toroidal core Inductors, and multilayer Inductors. Air core

14 Inductors are the simplest to make and cheapest to manufacture, with a wire wrapped around a

15 ceramic core. Iron core Inductors are wrapped around an iron core and can be smaller in size

16 than air core Inductors. Ferrite Inductors use ferrite, a metal oxide ceramic based around a

17 mixture of ferric oxide, which has a high degree of magnetic permeability. Toroidal core

18 Inductors are made using a coil wrapped around a toroidal (doughnut-shaped) core, often also

19 made of ferrite. Multilayer Inductors consist of two conductive coil patterns that are arranged in

20 two layers in the upper part of a multilayered body and are electrically connected in consecutive

21 manner. Thin film Inductors are a type of multilayer Inductor typically using a ceramic chip that

22 produces a small form factor. The Defendants each produce various types of Inductors.

23    52.    Inductors are a vital element of products used in automobiles, consumer

24 electronics, and industrial equipment. In automobiles, Inductors can be found in headlight

25 circuits, transmission and fuel systems, navigation and ADAS. In consumer electronics,

26 Inductors are used in LCD televisions, computer laptops, cameras, smartphones, and printers. In

27 industry applications, Inductors are used in security systems, audio line suppression, and power

28 line systems.

53.    This chart shows the variety and volume of end-products containing Inductors:



B.    **Inductor Market Characteristics and Other Factors Make Conspiracy Plausible**

54.    The Inductor conspiracy is plausible based on the following market characteristics and other factors: (a) Inductors are a standardized commodity; (b) market concentration; (c) high barriers to entry; (d) inelasticity of demand; (e) the existence a of government investigation into antitrust violations by Inductor manufacturers; (f) Panasonic's history of colluding to fix prices for critical components of consumer electronics; and (g) trade association activity involving some or all Defendants.

1.    **Inductors are a Standardized Commodity Product**

55.    Inductors are a commoditized product and can be found in the United Nations Commodity Statistics database under its own reference code (no. 77122).

56.    Inductors are marked using standardized values. The first two digits marking a standardized Inductor are the value of the inductance, expressed in units of Henry (or microhenry "μH"), and the third digit is the multiplier by power of 10. So, "101" = 10*101μH =

100μH. If there is an R, it acts as a decimal point and there is no multiplier. Therefore, "4R7" means 4.7μH. The precision of an Inductor is also expressed in standard terms, using a final letter F, G, J, K, or M, which refers to +/-1%, +/-2%, +/-5%, +/-10%, and +/-20%, respectively.

57.    The International Electrotechnical Commission, an organization promoting standardization in the electrical fields, published standards for testing relating to Inductors. Defendants' products refer to these standards. For example, TDK's product reference guide states that "[a]ll chokes [another name for Inductors] for low-frequency mains networks are dimensioned and tested in compliance with applicable EN and IEC standards." Inductors are mass produced pursuant to these standards, making them interchangeable.

58.    Defendants understand their products are interchangeable. A webpage maintained by TDK relating to Inductors allows users to enter a non-TDK product code so that, "[u]sing the part number of a product of other manufacturers, our [TDK] products with similar specifications can be searched." *See* https://product.tdk.com/en/search/inductor/inductor/smd/cross_reference/. Other Defendants' websites offer similar comparison aids.

## 2.    Market Concentration

59.    As noted above, market concentration within the Inductor industry is high. While there are a number of manufacturers, the Defendants collectively control a dominant global market share, as depicted in the following graphic.



60.    Acquisitions within the Inductor market, such as Murata Manufacturing's acquisition of TOKO in April of 2015 and TDK's successful tender offer for EPCOS AG in October of 2008, have added to this market concentration.

### 3.    High Entry Barriers

61.    Entry barriers into the Inductor market are high. Costs of maintaining extensive sales networks, supply chains, production facilities, and a global presence are considerable. Murata, for example, announced in February of 2016 the creation of an expanded 28,000 square foot facility in Carrollton, Texas to better integrate its United States operations.

62.    Barriers to entry also exist because of the resources of the incumbents. The Inductors market is a mature one dominated by established corporations, most of which have global operations. Panasonic and TDK both manufacture a variety of electronic products, as well as other electronic components. Panasonic reported revenues of over $62 billion in its 2017 fiscal year. TDK reported revenues of over $10 billion in 2017. Both are large and diverse multinational corporations that, like all Defendants, can benefit from economies of scale. Murata manufactures virtually every electronic component and has yearly revenues that top $5 billion. Taiyo Yuden is a diversified manufacturer of passive electronic components with annual net sales of over $2 billion, most of which is attributable to sales of electronic components. Also, Sumida recently announced sales of over $700 million annually. Sumida has R&D offices in the United States, Asia, Europe, and Canada; sales offices in the United States, Asia and Europe; and factories in Asia, Mexico and Europe.

63.    Meaningful new entry of Inductor manufacturers that could have posed a challenge to the Defendants did not occur during the Class Period. As alleged above, some of the Defendants acquired smaller companies.

### 4.    Demand Inelasticity

64.    Demand for Inductors is inelastic for several reasons. First, the prices of most Inductors are low in relation to the electronic equipment they are used in. Second, there are no ready substitutes for Inductors; other passive electronic components, like resistors or capacitors,

1    perform a different function altogether. And switching costs can be prohibitive, thus causing

2    OEMs to often stay with the same supplier.

3                    **5.    Subpoenas Issued By DOJ**

4            65.    On January 4, 2018, MLex media company reported:

5                    *Electronics manufacturers have been subpoenaed by US antitrust*
                    *prosecutors as part of a price-fixing investigation involving the inductor*
6                    *market, Mlex has learned.*

7                    *Subpoenas were sent out in mid-November, and the San Francisco office*
                    *at the Department of Justice's antitrust division is overseeing the*
8                    *investigation, it is understood.*

9                    *The inductor subpoenas are part of a long-running investigation, which*
                    *also includes capacitors and resistors. The components are part of*
10                   *electrical circuits that store and regulate the flow of electricity, and are*
                    *ubiquitous in electronic devices.*
11

12           66.    Panasonic may have given the DOJ information about a conspiracy in the

13   Inductors market, just as it has reportedly done with respect to the capacitors market, where

14   seven companies have pled guilty to antitrust violations. As alleged above, Taiyo Yuden is

15   reportedly cooperating in the investigation of the capacitors industry, which is ongoing.

16                   **6.    Panasonic's Involvement in Other Conspiracies**

17           67.    Collusion is also a plausible explanation of what occurred in the Inductors market

18   because Defendant Panasonic is a well-known recidivist antitrust violator. Panasonic, one of the

19   world's leading manufacturers of Inductors, has pled guilty in numerous price-fixing cases,

20   including electronic products.

21           68.    On September 30, 2010, Panasonic agreed to plead guilty and to pay a large

22   criminal fine for its participation in a conspiracy to price-fix refrigerant compressors from

23   October 14, 2004 through December 31, 2007.

24           69.    On July 18, 2013, Panasonic agreed to plead guilty and to pay a $45.8 million

25   criminal fine for its participation in a conspiracy to price-fix switches, steering angle sensors and

26   automotive high intensity discharge ballasts installed in cars sold in the United States and

27   elsewhere from at least as early as September of 2003 until at least February of 2010.

28

70.     Panasonic's subsidiary, SANYO Electric Co., Ltd., pled guilty and to a criminal charge for its participation in a conspiracy to fix the prices of cylindrical lithium-ion battery cells sold worldwide for use in notebook computer battery packs from about April 2007 until about September 2008. The production and sale of Inductors were often overseen by the same departments and personnel that were involved in fixing lithium ion battery prices.

71.     In 2008, Panasonic created "Rules Concerning Activity and Relationship with Competitors" that were supposed to ensure antitrust compliance; a Compliance Committee that meets annually was set up to monitor these efforts. The rules did not solve the problem. In its 2012 corporate "Sustainability Report," Panasonic stated:

> *In fiscal 2012, the company reviewed the efforts related to the company's compliance activities in the corporate "Compliance Committee" and discussed additional personnel measures. The top management again strongly restated that it is the company's policy not to engage in cartel activities and requests employees mainly in sales and marketing departments to confirm whether they encounter suspicious activities or not.*

https://www.panasonic.com/global/corporate/sustainability/pdf/sr2012e.pdf. The same report noted that Panasonic had created a Global & Group Risk Management Committee chaired by the President of the company and including directors and executive officers in charge of corporate operational functions at the company's headquarters. That group identified "Cartels" as one of its "corporate major risks."[3]

72.     The foregoing pattern of anticompetitive practices in various technology-related markets is illustrative of Panasonic's corporate conduct, which has included illegal activity aimed at generating profits at the expense of its customers. It is highly plausible that the same type of conduct occurred in the Inductors market.

73.     Faced with an overall decline in demand for their Inductors, and steep price declines after the introduction of the ITA, Panasonic and its colleagues had a keen desire to avoid price competition.

---

[3] https://www.panasonic.com/global/corporate/sustainability/pdf/sr2013e.pdf

74.     The highly concentrated nature and structure of the Inductors market made it likely that collusion would be both possible and profitable. As shown above, Defendants comprised over 75% of the market during much of the Class Period. They thus engaged in a historically unprecedented set of increases for Inductor prices that lasted at least eleven years.

### 7.     Trade Associations to Facilitate the Conspiracy

75.     Defendants agreed to operate as a cartel through both oral and written communications among directors, executives, officers, business unit managers, sales representatives, and employees of the Defendant companies.

76.     Trade associations provided opportunities for Defendants to meet frequently and exchange information to facilitate collusion. Defendants are members of a number of trade associations in the United States, Asia and Europe. Their overlapping membership in various trade associations also provided incentive for cartel members to stay within the illegally agreed upon price framework, as they could monitor and police one another's activities in the Inductor market and punish non-compliance. Defendants' participation in trade associations, as described above, helped facilitate their collusion.

77.     One such organization is the Electronic Components Industry Association ("ECIA"), which is located in Alpharetta, Georgia. Several of the Defendants are members of this organization, including MENA, Sumida America, TDK America, and PCNA (through its division Panasonic Industrial Sales Company of America). They regularly meet to discuss matters of mutual concern. As the website of the ECIA states:

> *ECIA provides resources and opportunities for members to improve their business performance while enhancing the industry's overall capacity for growth and profitability. From driving critical conversations and process optimization to product authentication and industry advocacy, ECIA is your trusted source for support, insight and action.*
>
> *Bringing together the talent and experience of broad array of industry leaders and professionals representing all facets of the electronics components supply chain, ECIA is uniquely positioned to enable individual connection as well as industry-wide collaboration. As the supply chain becomes increasingly more complex, ECIA serves as a vital nexus for refinement and progress.*

https://www.ecianow.org/about-ecia/what-we-do/.

CLASS ACTION COMPLAINT                                                    17

78.    For manufacturers, the ECIA promises access to "[d]ata & statistics for better decision-making (Executive summaries, confidence surveys, end market reports, etc.)", the opportunity to "[s]hape opinion and direction by participating on Councils and Committees that design, develop, and publish processes the industry will follow" and "[n]etworking among the industry leaders (…can't have enough professional relationships!)."

https://www.ecianow.org/join-ecia/manufacturer/.

79.    The data and statistics mentioned by ECIA are significant. For the Inductors market, ECIA prepares quarterly sale reports of Inductors sold in North America, as well as indices of monthly and weekly sales of electronic components. https://www.ecianow.org/north-america-sales-booking-reports/. The ECIA also has a Statistics and Industry Data Council, the role of which is defined as follows:

> *The Statistics and Industry Data Council oversees several programs that collect and provide unique industry data. These include commodity and market segment level sales trends as well as discrete passive electronic components market reports... The primary outputs are the Electronic Component Sales Trends survey (ECST) and the MS Series, a collection of 13 individual reports on capacitors, resistors, and inductors that include world statistics.*

https://www.ecianow.org/about-ecia/councils/statistics-industry-data-council/. The same webpage goes on to list among "2014 accomplishments" that the Statistics and Industry Data Council "[c]ompiled and published more than 100 statistics reports (MS series) on *North America Sales and Booking* for capacitors, resistors and inductors plus monthly reports on world statistics for capacitors and quarterly reports for world statistics for resistors and inductors." Within the council is the "Passive Components Market Services Working Group," of which TDK America, Panasonic Corporation, and MENA are members.

80.    Such organizations provide Defendants with the opportunity to meet, have improper discussions under the guise of legitimate business contacts, and perform acts necessary for the operation and furtherance of the conspiracy. ECIA, for example, hosts an annual "Executive Conference." The 2014 conference was held in Chicago, Illinois, and the 2015 conference was held in Chicago on October 25-27, 2015. ECIA also hosts an "EDS Summit" that includes electronic component manufacturers "where valuable idea exchange can happen

1    through high-level strategic meetings, event functions and informal gatherings."

2    https://www.ecianow.org/connection-points/eds/. This year's EDS Summit will take place on

3    May 15-18, 2018 in Las Vegas, Nevada.

4        81.    The conspiracy regarding Inductors was carried out, in part, under the auspices of

5    the Japan Electronics and Information Technology Industries Association ("JEITA"), as was the

6    case in the capacitor conspiracy. Each of the Defendants is a member of JEITA. Through JEITA

7    meetings, as well as meetings of another trade association described below, Defendants

8    exchanged competitively sensitive information and reached agreements just as some Defendants

9    did in the capacitor conspiracy.

10        82.    JEITA conducts an annual conference described as follows: "[a]ll JEITA member

11    companies gather annually for a conference that serves as the industry's premier decision-

12    making forum." http://www.jeita.or.jp/english/about/orga/index.htm. Its Board of Directors

13    "discusses and makes decisions concerning important issues related to JEITA's activities,

14    including items raised at the Annual Conference." *Id*. JEITA has created five sector-specific

15    boards including an Electronics Component Board. One of the current Vice-Chairmen of the

16    Electronic Components Board is Tsuneo Murata, the President of Murata Manufacturing and

17    Takehiro Kamigama, President and CEO of TDK. As of July 7, 2017, the Chairman of JEITA is

18    Shusaku Nagae, Chairman of the Board of Panasonic. JEITA maintains an office in Washington,

19    D.C.

20        83.    JEITA holds periodic meetings lasting up to several days. There are formal

21    meetings as well as social events, such as meals and parties. In addition, JEITA has

22    subcommittees organized by general product types and purposes, such as the Passive

23    Components Subcommittee. Subcommittees also meet periodically, telephonically and

24    sometimes in person. On information and belief, JEITA also has working groups organized by

25    specific passive component.

26        84.    Through JEITA meetings, Defendants had the opportunity to exchange

27    competitively sensitive information on price and volume, and for specific bids.

28

85.     Trade organizations such as JEITA are often pretext for industry members to conspire. It has now been publicly admitted that membership in JEITA played a large role in facilitating collusion by the defendants in other price-fixing conspiracies.

## VI.    TOLLING OF THE STATUTE OF LIMITATIONS PURSUANT TO THE INJURY-DISCOVERY RULE AND THE DOCTRINE OF FRAUDULENT CONCEALMENT

86.     Plaintiff and members of the Class could not have discovered, with reasonable diligence, the existence of the conspiracy, or the fact that they had been injured as a result of it, until the DOJ's investigation was made public in January of 2018.

87.     Defendants actively concealed the existence of the conspiracy from Plaintiff and members of the Class, and there is nothing in the public domain that would put Plaintiff or anyone else on notice that Defendants were conspiring at meetings regarding prices for Inductors sold in the United States.

88.     The meetings held by Defendants were furtive. The nature of a price-fixing cartel requires secrecy.

## VII.    CLASS ACTION ALLEGATIONS

89.     Plaintiff brings this action on behalf of itself and as a class action pursuant to Federal Rules of Civil Procedure 23(a), (b)(2) and (b)(3), on behalf of the members of a Class, which is defined as follows:

> All persons or entities in the United States, its territories, and the District of Columbia, who purchased Inductors (including through controlled subsidiaries, agents, affiliates, or joint ventures) directly from any of the Defendants, their subsidiaries, agents, affiliates or joint ventures from January 1, 2003 through December 31, 2016 (the "Class Period"). Excluded from the Class are Defendants and their co-conspirators, subsidiaries, agents, and/or affiliates; Defendants' officers, directors, management, employees, subsidiaries, and/or agents; all governmental entities; and the Judges and chambers staff presiding over this case, as well as any members of their immediate families.

90.     The Class definition encompasses those who purchased Inductors, and/or a finished product containing one or more Inductors, directly from any of the Defendants, even if the Inductors purchased were manufactured, sold, or distributed by a given Defendant's predecessors, parents, business units, subsidiaries, affiliated entities, principals, agents, or co-conspirators.

91.     While Plaintiff does not know the exact number of the members of the Class, Plaintiff believes there are at least thousands of members.

92.     Plaintiff also does not know the exact duration of the alleged conspiracy and reserves the right to amend its complaint.

93.     Common questions of law and fact exist as to all members of the Class. This is particularly true given the nature of Defendants' conspiracy, which was applicable to all members of the Class, thereby making appropriate relief with respect to the Class as a whole. Such questions of law and fact common to the Class include, but are not limited to:

    a.    Whether Defendants engaged in combination and conspiracies among themselves to fix, raise, maintain, and/or stabilize the prices of Inductors sold to or billed in in the United States;

    b.    The identity of the participants of the alleged conspiracy;

    c.    The duration of the alleged conspiracy and the acts carried out by Defendants in furtherance of the conspiracy;

    d.    Whether the alleged conspiracy violated the Sherman Act;

    e.    Whether the conduct of Defendants, as alleged in this Complaint, caused injury to the business or property of Plaintiff and members of the Class;

    f.    The effect of the alleged conspiracy on the prices of Inductors sold in the United States during the Class Period;

    g.    The appropriate injunctive and related equitable relief; and

    h.    The appropriate class-wide measure of damages.

94.     Plaintiff's claims are typical of the claims of the members of the Class, and Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff and all members of the Class are similarly affected by Defendants' wrongful conduct in that they paid artificially inflated prices for Inductors purchased directly from Defendants.

95.     Plaintiff's claims arise out of the same common course of conduct giving rise to the claims of the other members of the Class. Plaintiff's interests are coincident with, and not antagonistic to, those of the other members of the Class. Plaintiff is represented by counsel who

1    are competent and experienced in the prosecution of antitrust, unfair competition, and class

2    action litigation.

3        96.    The questions of law and fact common to the members of the Class predominate

4    over any questions affecting only individual members, including legal and factual issues relating

5    to liability and damages.

6        97.    Class action treatment is a superior method for the fair and efficient adjudication

7    of the controversy, in that, among other things, such treatment will permit a large number of

8    similarly situated persons to prosecute their common claims in a single forum simultaneously,

9    efficiently and without the unnecessary duplication of evidence, effort and expense that

10   numerous individual actions would engender. The benefits of proceeding through the class

11   mechanism, including providing injured persons or entities with a method for obtaining redress

12   for claims that it might not be practicable to pursue individually, substantially outweigh any

13   difficulties that may arise in management of this class action.

14       98.    The prosecution of separate actions by individual members of the Class would

15   create a risk of inconsistent or varying adjudications, establishing incompatible standards of

16   conduct for Defendants.

17   **VIII.   CLAIM FOR RELIEF**

18                  **VIOLATIONS OF THE SHERMAN ACT**
                         **15 U.S.C. §§ 1 and 3**
19                   **(Alleged against all Defendants)**

20       99.    Plaintiff hereby incorporates by reference each preceding and succeeding

21   paragraph as though fully set forth herein.

22       100.   Defendants violated Sections 1 and 3 of the Sherman Act by conspiring to

23   artificially restrict competition in the market for Inductors. Starting January 1, 2003 Defendants

24   met repeatedly to exchange competitively sensitive information, including price and price-related

25   information. The effect of these meetings was to raise, fix, set, stabilize, or otherwise artificially

26   manipulate the prices of Inductors beyond the natural interplay of supply and demand.

27

28

101.     Defendants formed a cartel, organized around JEITA meetings, designed to raise, fix, set, stabilize, or otherwise artificially manipulate the prices of Inductors beyond the natural interplay of supply and demand.

102.     As a result of Defendants' and their co-conspirators' unlawful conduct and acts taken in furtherance of their conspiracy, prices for Inductors sold to purchasers in the United States during the Class Period were raised, fixed, maintained, or stabilized at artificially inflated cartel levels.

103.     The combination or conspiracy among Defendants consisted of a continuing agreement, understanding and concerted action among Defendants and their co-conspirators.

104.     For purposes of formulating and effectuating their combination or conspiracy, Defendants and their co-conspirators did those things they combined or conspired to do, including setting prices of Inductors at supra-competitive prices, and selling these Inductors to Plaintiff and the members of the Class.

105.     Defendants' anticompetitive and unlawful conduct is illegal *per se*.

106.     As a result of Defendants' anticompetitive and unlawful conduct, Plaintiff and the members of the Class have been injured in their businesses and property in that they have paid more for the Inductors that they purchased during the Class Period than they otherwise would have paid but for Defendants' conduct.

## IX.     PRAYER FOR RELIEF

107.     Plaintiff requests that the Court enter judgment on their behalf and on behalf of the Class that:

A.     This action may proceed as a class action, with Plaintiff serving as Class Representatives under Fed. R. Civ. P. 23(c);

B.     Defendants have violated Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1 and 3) and that Plaintiff and the Class have been injured in their business and property as a result of Defendants' violations;

C.     Plaintiff and the Class are entitled to recover damages sustained by them, as provided by the federal antitrust laws under which relief is sought herein, and that

1    a joint and several judgment in favor of Plaintiff and the Class be entered against

2    Defendants in an amount subject to proof at trial, which is to be trebled in

3    accordance with Section 4 of the Clayton Act, 15 U.S.C. § 15;

4    D.    Plaintiff and the Class are entitled to pre-judgment and post-judgment interest on

5    the damages awarded them, and that such interest be awarded at the highest legal

6    rate from and after the date this class action complaint is first served on

7    Defendants;

8    E.    Plaintiff and the Class are entitled to equitable relief appropriate to remedy

9    Defendants' restraint of trade, including issuing a permanent injunction against

10    Defendants and their parents, subsidiaries, affiliates, successors, transferees,

11    assignees and the respective officers, directors, partners, agents, and employees

12    thereof and all other persons acting or claiming to act on their behalf from

13    repeating (or continuing and maintaining) the conspiracy or agreements alleged

14    herein;

15    F.    Defendants are to be jointly and severally responsible financially for all costs,

16    including the expenses of a Court-approved notice program;

17    G.    Plaintiff and the Class recover their reasonable attorneys' fees as provided by law;

18    and

19    H.    Plaintiff and the Class receive such other or further relief as may be just and

20    proper.

21    ///

22    ///

23    ///

24

25

26

27

28

CLASS ACTION COMPLAINT    24

**X.     JURY DEMAND**

Pursuant to Federal Rules of Civil Procedure, rule 38(c), Plaintiff demands a trial by jury on all matters so triable.

DATED: January 31, 2018                          **BERMAN TABACCO**

By:   */s/ Todd A. Seaver*
                     Todd A. Seaver

Joseph J. Tabacco, Jr.
Jessica Moy
Sarah Khorasanee McGrath
44 Montgomery Street, Suite 650
San Francisco, CA  94104
Telephone: (415) 433-3200
Facsimile:  (415) 433-6382
Email: jtabacco@bermantabacco.com
           tseaver@bermantabacco.com
           jmoy@bermantabacco.com
           smcgrath@bermantabacco.com

Marc Greenspon (*pro hac vice* to be filed)
One Liberty Square
Boston, MA 02109
Telephone: (617) 542-8300
Facsimile:  (617) 542-1194
Email: mgreenspon@bermantabacco.com

*Attorneys for Plaintiff Cambridge Capital Corporation*

Vincent Briganti (*pro hac vice* to be filed)
Barbara Hart (*pro hac vice* to be filed)
**LOWEY DANNENBERG P.C**.
White Plains Plaza
44 South Broadway, Suite 1100
White Plains, NY 10601
Telephone: (914) 997-0500
Facsimile:  (914) 997-0035
Email: vbriganti@lowey.com
           bhart@lowey.com

Brian Murray (*pro hac vice* to be filed)
Lee Albert (*pro hac vice* to be filed)
**GLANCY PRONGAY & MURRAY**
230 Park Avenue, Suite 530
New York, NY 10169
Telephone: (212) 682-5340
Facsimile: (212) 884-0988
Email: bmurray@glancylaw.com
        lalbert@glancylaw.com

*Additional Attorneys for Plaintiff*
*Cambridge Capital Corporation*